**Carl CLARK, David Barger and Edward Schwab, individually, and on behalf of all others similarly situated, Plaintiffs,**

v.

**WITCO CORPORATION, Defendant.**

**No. CIV. A. 98–300 ERIE.**

United States District Court,
W.D. Pennsylvania.

Jan. 13, 2000.

---

John Paul Garhart, Arthur D. Martinucci, Quinn, Buseck, Leemhuis, Toohey & Kroto, Inc., Erie, PA, for Plaintiffs.

Thomas A. Donovan, Kirkpatrick & Lockhart, Pittsburgh, PA, Kenneth A. Margolis, Laura Sack, Kauff, McClain & McGuire, New York City, for Defendant.

## MEMORANDUM OPINION AND ORDER

McLAUGHLIN, District Judge.

This civil action arises out of the sale of a refinery and blending and packaging plant in Bradford, Pennsylvania. Plaintiffs claim they are entitled to severance benefits because the sale effectively ended their employment relationship with the Defendant. Presently pending before the Court is Defendant's Motion to Dismiss or, in the alternative, for Summary Judgment. For all of the following reasons, the motion is granted.

### I. BACKGROUND

Defendant Witco Corporation ("Witco") is a global specialty manufacturer with numerous facilities located throughout the United States and around the world. *See* Tabakman Aff. ¶ 2. In the past, it owned the Kendall/Amalie Division which was part of its Lubricants Group. *See id.* ¶ 4. It also owned a refinery and blending and packaging plant in Bradford, Pennsylvania

("Bradford Refinery"). *See id.* ¶ 5. Plaintiffs David Barger, Carl Clark and Edward Schwab are all former employees of Witco; they for worked for Witco at the Bradford Refinery until February 28, 1997, the date it was sold. *See* Barger Aff. ¶¶ 2–3; Clark Aff. ¶¶ 2–3; Schwab Aff. ¶¶ 2–3.

On October 1, 1976, Witco issued a handbook ("Bradford Handbook") which was a site-specific procedures manual. *See* Tabakman Aff. ¶ 19. It complemented and did not supercede or supplant the more comprehensive Witco Personnel Manual. *See id.* The Bradford Handbook included a severance benefit policy which provided, "In any instance where the Company terminates employment through no fault of the employee and provided the employee has not reached age sixty-five (65) or has not become totally disabled, such employee shall be entitled to a lump sum severance pay." Sack Aff. Ex. A at 20. The severance benefit would be calculated according to years of service but was not to exceed fifty days pay. *See id.*

Between 1978 and 1997, Witco adopted at least eight different severance policies including in 1978, 1981, 1983, 1987, 1991, September 1995, November 1995 and 1997. *See* Tabakman Aff. ¶ 20. Each of these policies provided that employees whose employment was continued by a successor company were not eligible for severance benefits. *See id.* In November of 1995, Witco announced that it planned to divest its Lubricants Group. *See id.* ¶ 6. It informed its employees that it had designed a severance program for Lubricants Group employees not offered employment with the buyer or within Witco; according to Witco, the program was more generous than that established in the 1976 handbook. *See id.* ¶ 7. The letter provided, "If you are not offered employment with the prospective buyer(s), or within Witco, you will be entitled to ... an enhanced severance pay program [which will provide] 1 ½ weeks pay for each year of service, with a minimum of 12 weeks and a maximum of 52 weeks." *Id.* Ex. A. It also stated,

"Please be aware that if your employment with Witco is continued, the program benefits described above will not be applicable." *Id.*

On August 5, 1996, Witco announced that it was selling certain assets of its Kendall/Amalie division to Sun Company, Inc. *See id.* ¶ 9. Sun did not purchase the Bradford Refinery, although it did subsequently hire approximately seventy-five Bradford employees. *See id.* Consistent with the terms of the November 1995 severance policy, none of those employees received severance benefits. *See id.* ¶ 10. The same day, "virtually all Bradford Refinery employees (including Plaintiffs herein) were offered 'stay' bonuses as an incentive for these employees to continue their employment with Witco until Witco either sold the Bradford facility or discontinued its operations at the facility." *Id.* ¶ 12. The bonuses were in an amount equal to one week's base salary for each completed month of service beginning August 5, 1996. *See id.* The minimum stay bonus was four weeks' pay, and partial months were prorated. *See id.* Witco also offered these employees continued medical and dental coverage at employee rates under Witco sponsored plans. *See id.* The continuation period was equal to one month for each completed month of service beginning August 5, 1996. *See id.* The minimum extension period was three months, with partial months rounded up. *See id.*

Subsequently, Witco began negotiating with American Refining Group, Inc. ("ARG") for the sale of the Bradford Refinery. *See id.* ¶ 13. According to Diane H. Tabakman, Director of Human Resources of Witco, "Witco insisted as a condition of sale that ARG continue to employ as many of Witco's Bradford Refinery employees as possible on terms and conditions substantially equivalent to the terms and conditions those employees had enjoyed during the course of their employment with Witco." *Id.*

On July 30, 1996, Nancy Zetts sent a memorandum to all employees who would be affected by the sale in an attempt to answer some frequently asked questions. *See* Barger Aff.Ex. E. In it, she stated, "you will be entitled to severance pay if you are not offered a comparable position with the buyer or within Witco." *Id.* at 8. According to Plaintiffs, a large number of employees wrote to Witco about this but received no response. *See* Barger Aff. ¶ 14 & Ex. F; Clark Aff. ¶ 14 & Ex. E.

On December 6, 1996, ARG and Witco entered into an Asset Purchase Agreement. *See id.* Ex. C. The agreement stated,

> Buyer shall endeavor to offer employment, commencing on the Closing Date, to as many of the employees in the Refinery and Administrative departments, including those on vacation, leave of absence or short-term disability, who were employed by Seller immediately prior to the Closing Date in the Refinery and Administrative departments and Newark, Ohio (the "Business Employees") as practicable. Such offers shall be made at a rate of compensation that is at least 87.5% of the rate of compensation provided to such employees by Seller immediately prior to the Closing Date.

*Id.* It also stated that ARG would provide continuing employees who were terminated within a year of the effective date of the agreement with severance benefits no less favorable than the greater of the severance (i) provided to similarly situated ARG employees under its severance benefit plans and practices then in effect and (ii) provided by Witco on the date of the agreement. *See id.* Further, the continuing employees' service with Witco would be credited when calculating their eligibility under ARG benefit plans. *See id.*

Witco adopted a new severance plan on January 1, 1997. *See id.* ¶ 20. It provided that an employee would be eligible for the benefits if his or her employment with Witco was terminated for any reason except the following: (1) the employee was

transferred within the company or to an affiliate; (2) termination due to death, disability or failure to return from a leave of absence; and (3) termination of employment with employer as a result of a court decree, sale of stock or assets, merger or other combination, spinoff, a reorganization or liquidation, and dissolution or other winding of a business involving the employer. *See id.* Ex. F § 2.6. The plan stated, "This Plan supersedes any and all prior severance arrangements, policies, plans or practices of the Company and of any Participating Company (whether written or unwritten)." *Id.* § 7.5. It also provided, "The Company reserves the right to amend or terminate the Plan at any time." *Id.* § 5.1.

The sale of the refinery to ARG was effective on February 28, 1997 and ARG took over the refinery on March 1, 1997. *See id.* ¶¶ 14–16. Approximately thirty-four Witco employees were not offered jobs by ARG and instead received severance benefits from Witco. *See id.* ¶ 16. Most of Witco's employees, including Plaintiffs, remained at their same job without interruption. *See id.;* Barger Aff. ¶ 3; Clark Aff. ¶ 3; Schwab Aff. ¶ 3. The conditions of their employment were different after the sale, however. Most hourly employees, including Plaintiffs, suffered a 9% reduction in wages, lost two weeks' vacation, saw reductions in paid holidays, and saw reductions in sick day accruals. *See* Barger Aff. ¶¶ 5–6; Clark Aff. ¶¶ 5–6; Schwab Aff. ¶¶ 5–6. Further, the employer matching contribution dropped from $.50 on the dollar to $.25 on the dollar and ARG did not offer any benefits over and above the 401k, as Witco did. *See* Barger Aff. ¶ 6; Clark Aff. ¶ 6; Schwab Aff. ¶ 6. These employees were denied severance benefits. *See* Tabakman Aff. ¶ 16. Plaintiffs brought the instant action in October of 1998 challenging the decision to deny them benefits.

## II. STANDARD OF REVIEW

A movant is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). This rule allows parties to demonstrate prior to trial that opposing claims "have no factual basis." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The inquiry here is "whether there is any need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the initial burden of demonstrating that no genuine issue of material fact exists. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Thereafter, the burden shifts to the non-moving party to demonstrate that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. All inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

## III. DISCUSSION

Witco argues that it is entitled to summary judgment because Plaintiffs were properly denied benefits under the 1997 severance policy. Plaintiffs challenge the validity of that policy, however, and argue that they are entitled to benefits under the 1976 severance policy. In this regard, Plaintiffs argue: (1) that the 1976 plan does not contain an amendment procedure, as required by section 402(b)(3) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1102(b)(3); (2) that this omission renders invalid all subsequent amendments to the 1976 severance policy so that it was

still in effect at the time of the sale; and (3) that they are entitled to benefits under the terms of the 1976 severance policy. We will first address the threshold issue of whether the 1976 plan contained an amendment procedure in compliance with section 402(b)(3).

Section 402(b)(3) requires that every employee benefit plan provide (1) a "procedure for amending [the] plan" and (2) "[a procedure] for identifying the persons who have authority to amend the plan." *Curtiss–Wright Corp. v. Schoonejongen*, 514 U.S. 73, 82, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995). According to the Supreme Court, the primary purpose of this section is "to ensure that every plan *has* a workable amendment procedure." *Id.*

The Supreme Court recently addressed the level of detail required for compliance with section 402(b)(3). In *Curtiss–Wright Corporation v. Schoonejongen*, 514 U.S. 73, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995), the employer, Curtiss Wright, voluntarily maintained a post-retirement health plan for employees who worked at its facilities. *See id.* at 75, 115 S.Ct. 1223. The plan included a standard reservation of rights provision: "The Company reserves the right at any time to amend the plan." *Id.* In 1983, the employer issued a revised summary plan description which provided that coverage under it would cease "upon the termination of business operations of the facility from which [the employee] retired." *Id.* Later the same year, the company announced the closure of the facility at which the plaintiffs previously worked; the plaintiff retirees were notified of the closure and of the fact that their post-retirement health benefits were being terminated. *See id.* at 76, 115 S.Ct. 1223. Plaintiffs sued the employer claiming that they were entitled to benefits under the original plan; they argued that the subsequent amendment was not valid because the original plan did not contain an amendment procedure. *See id.* at 78, 115 S.Ct. 1223.

On appeal, the Supreme Court established a de minimus standard for compliance with section 402(b)(3). It concluded, "[t]he literal terms of § 402(b)(3) are ultimately indifferent to the level of detail in an amendment procedure, or in an identification procedure for that matter." *Id.* at 80, 115 S.Ct. 1223. The Court held that the reservation of rights clause satisfied the second requirement of 402(b)(3) because it identified "[t]he Company" as the person with authority to amend the plan. *Id.* at 79, 115 S.Ct. 1223. According to the Court, "To say that one must look always to '[t]he Company' is to say that one must look *only* to '[t]he Company' and *not* to any other person-that is, not to any union, not to any third—party trustee, and not to any of the other kinds of outside parties that, in many other plans, exercise amendment authority." *Id.* The Court explained that "[t]he Company" was not too vague because corporate law principles may identify which individuals actually have the authority. *Id.* at 80, 115 S.Ct. 1223. Further, the Court held that the first requirement, that the plan contain "a procedure for amending [the] plan," was also satisfied by the reservation of rights clause. *Id.* at 79, 115 S.Ct. 1223. It concluded that the clause essentially stated that "the plan may be amended by a unilateral company decision to amend, and only by such a decision—and not, for example, by the unilateral decision of a third-party trustee or upon the approval of the union." *Id.*

The Third Circuit applied this reasoning in *Ackerman v. Warnaco, Inc.*, 55 F.3d 117 (3d Cir.1995). There, the 1988 Employee Handbook provided for severance benefits; it stated, however, that such benefits may not be available under certain circumstances, including "*if, prior to termination of your employment, management has altered or rescinded this termination allowance policy.*" *Id.* at 120. Two years later, the employer rescinded the termination allowance policy in a memorandum it sent to employees. *See id.* Plaintiffs sued for benefits under the original policy contending that it did not provide a procedure for

amendment. *See id.* at 122. Specifically, plaintiffs contended that the plan did not "identify specifically the entity with the authority to alter plan benefits." *Id.* Citing *Curtiss–Wright,* the Third Circuit disagreed and held that "designating 'the management' as the entity with authority to alter the plan satisfies the requirements of section 402(b)(3)." *Id.* In a footnote, the court noted that it was a close case because it is more difficult to identify the specific persons who would act on behalf of "the management" than it is to identify those which may act on behalf of the company pursuant to corporate law. *Id.* at 122 n. 2. Nevertheless, the court determined that the clause set forth a procedure to amend; it remanded for a determination of whether the employer complied with that procedure. *See id.* at 122.

Witco argues that when read together with the Bradford Handbook, the Witco Personnel Manual sets forth an amendment procedure which meets the standards set out in *Curtiss–Wright.* Specifically, it points out that the manual's stated purpose was to "keep current with the latest developments in personnel policy and procedures as they are approved." Tabakman Aff. Ex. F. It also stated, "Personnel Policies and Procedures will be kept up to date, and new material will be issued as it is approved." *Id.* Further, Witco argues that the manual identified the persons who would make those amendments when it stated, "Whenever possible, the policies and procedures would be reviewed with operating heads and key personnel under the guidance of Mr. H.J. Miller, Director of Personnel. Personnel Policies are recommended to and reviewed by the Company Operating Committee; and when necessary, approved by the Executive Committee of the Company." *Id.*

■ Based on the record before us, we agree that the Bradford Handbook and the Witco Personnel Manual should be read together. The Personnel Manual contemplated division-specific policies such as the Bradford Handbook, stating that a majority of the policies would be company-wide while a few would be division-specific. *See* Tabakman Aff. Ex. D. Further, Diane Tabakman, Director of Human Resources for Witco, stated in her affidavit that the Bradford Handbook was a "site-specific procedures manual ... [that] complemented, and did not supersede or supplant, the more comprehensive Witco Personnel Manual." *Id.* ¶ 19.

We must next determine whether the language in the introduction to the Witco Personnel Manual cited by Witco comports with section 402(b)(3). In terms of the first requirement of 402(b)(3), Plaintiffs argue that while the language may set forth a procedure, it does not set forth a procedure to *amend.* They maintain that to do so, the plan must use the terms "change", "amend", "rescind", "modify" or "revoke." However, section 402(b)(3) does not require that certain magic words be utilized, *see Curtiss–Wright,* 514 U.S. at 80, 115 S.Ct. 1223 ("the literal terms of § 402(b)(3) are ultimately indifferent to the level of detail in an amendment procedure"), and it makes little sense to invalidate numerous amendments in their absence when the language used conveys essentially the same message. In this regard, the word "amend" is defined as "to alter formally by modification, deletion or addition." WEBSTER'S NINTH NEW COLLEGE DICTIONARY 78 (9th ed.1990); *see also* BLACK'S LAW DICTIONARY 81 (6th ed.1990) (defining "amendment" as "To alter by modification, deletion, or addition."). Certainly, in stating that it would keep the policies "up to date" and "current with the latest developments in personnel policy," Tabakman Aff. Ex. E, Witco reserved the right to alter the policies by modification, deletion or addition. Further, one can infer that such amendment was contemplated because the manual stated that "new material will be issued as it is approved." *Id.* There would be no need to issue new material if the policies contained therein were not changed, amended, rescinded, modified or revoked in some way.

Moreover, the language at issue satisfies the second requirement of 402(b)(3) in that it sets forth a procedure for "identifying the persons who have authority to amend the plan." *Curtiss–Wright,* 514 U.S. at 78, 115 S.Ct. 1223 (quoting 29 U.S.C. 1102(b)(3)). In this regard, the Witco Personnel Manual is more detailed than the plans at issue in *Curtiss–Wright* and *Ackerman.* In those cases, the plan only identified "the Company" or "Management" as the person with authority and left it to corporate law to define who could act on behalf of the company or management. Here, however, the Personnel Manual specifies particular committees within the company that have the authority to act; it states that amendments are to be "recommended to and reviewed by the Company Operating Committee, and when necessary, approved by the Executive Committee of the Company." Tabakman Aff. Ex. F. One need only obtain a list of persons who serve on those committees to determine who has the authority to amend the plan.

Plaintiffs next argue that the language in the Witco Personnel Manual cannot constitute an amendment procedure because it was not disseminated or made available to the employees. They maintain that the purpose of 402(b)(3) is to provide a means by which an employee can ascertain his or her rights and obligations under the plan. According to Plaintiffs, an amendment procedure which is kept confidential and only made available to employees in the personnel department is defective because it does not further that purpose.

Plaintiffs misconstrue *Curtiss–Wright* and the purpose of section 402(b)(3). In *Curtiss–Wright,* the plaintiffs similarly argued that section 402(b)(3) was intended to "guarantee that the procedure conveys enough detail to enable beneficiaries to learn their rights and obligations under the plan at any time." *Curtiss–Wright,* 514 U.S. at 83, 115 S.Ct. 1223. The Court rejected this argument, however. It acknowledged that "one of ERISA's central goals is to enable plan beneficiaries to learn their rights and obligations at any time" but stressed that other provisions of ERISA, namely the reporting and disclosure requirements, accomplish this goal. *Id.* The Court stated, "And we do not think Congress intended [the reporting and disclosure requirements] to be supplemented by a faraway provision in another part of the statute [section 402(b)(3) ], least of all in a way that would lead to improbable results." *Id.* at 84, 115 S.Ct. 1223.

The Court concluded that the primary purpose of section 402(b)(3) is "to ensure that every plan has a workable amendment procedure." *Id.* at 82, 115 S.Ct. 1223. According to the Court, this requirement served the following goals:

> First, for a plan not to have such a procedure would risk rendering the plan forever unamendable under standard trust law principles. Second, such a requirement increases the likelihood that proposed plan amendments, which are fairly serious events, are recognized as such and given the special consideration they deserve. Finally, having an amendment procedure enables plan administrators, the people who manage the plan on a day-to-day level, to have a mechanism for sorting out, from among the occasional corporate communications that pass through their offices and that conflict with the existing plan terms, the bona fide amendments from those that are not. In fact, plan administrators may have a statutory responsibilities to do this sorting out.

*Id.* at 82, 115 S.Ct. 1223. We do not believe that dissemination of the amendment procedure is necessary to accomplish these goals. Therefore, the failure to do so does not render the amendment procedure defective.[1]

---

1. Plaintiffs appear to argue that the 1997 severance policy is void because they were not put on notice of its terms and of the fact that it superceded the 1976 policy. However, the

Since we conclude that the 1976 plan contains an amendment procedure that complies with section 402(b)(3), we need not address whether the lack of an amendment procedure would invalidate all subsequent amendments or whether Plaintiffs are entitled to benefits under the 1976 severance policy. Instead, we will review Witco's decision to deny benefits under the 1997 severance policy.

According to the Supreme Court, a denial of benefits "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 108, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). If the plan affords the administrator such discretion, then the denial is reviewed under the abuse of discretion standard. *See id.*

Here, the 1997 severance policy expressly provided the Employee Benefits Committee of the Witco Board of Directors with discretionary authority to determine eligibility for benefits and to construe the terms of the plan. Indeed, section 3.1 provides, "The determination of whether Severance Benefits will be granted to Eligible Employees ... shall be made in the sole discretion of the Committee in each individual circumstance." Tabakman Aff. Ex. E. § 3.1. Also, section 6 of the policy grants the Committee exclusive authority to "interpret, in its sole discretion, any and all of the provisions of the Plan." *Id.* § 6.1. Thus, we will review Witco's determination for abuse of discretion and its interpretation of the plan " 'will not be disturbed if reasonable.' " *Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 437 (3d Cir.1997) (quoting *Bruch,* 489 U.S. at 114, 109 S.Ct. 948).

We conclude that the denial of severance benefits to employees who continued their employment with ARG was reasonable. In fact, the 1997 severance policy expressly provided that employees in this situation would not receive benefits. It stated that employees would not be entitled to benefits if their termination of employment with Witco resulted from "a court decree, a sale of stock or assets (whether, in whole or in part), a merger or other combination, spinoff, a reorganization or liquidation, dissolution or other winding up of a business involving the Employer, unless the Company expressly provides that Severance Benefits will be provided as a result of such termination." Tabakman Aff. Ex. F § 2.6(c).

## IV. CONCLUSION

An appropriate order follows.

## *ORDER*

AND NOW, this __ day of January 2000, for the reasons stated in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Defendant's Motion to Dismiss or, in the alternative, for Summary Judgment [Doc. No. 30] is GRANTED.

---

Third Circuit has repeatedly held that "defects in fulfilling the reporting and disclosure requirements of ERISA do not give rise to a substantive remedy ... [unless] the plaintiff can demonstrate the presence of 'extraordinary circumstances' " such as bad faith or active concealment. *Ackerman v. Warnaco, Inc.,* 55 F.3d 117, 124–25 (3d Cir.1995). Plaintiffs have pointed to no such evidence.